IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ASSOCIATION OF TAXICAB OPERATORS, USA, D.E.C.D.A., INC. d/b/a STARCAB, MAREDI CORPORATION d/b/a UNITED CAB, E.P.D.A., INC. d/b/a ALAMO CAB, INC. WALAAL CORPORATION d/b/a AMBASSADOR CAB COMPANY, and PLAINTIFFS LISTED IN EXHIBIT A, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. _____ |
| YELLOW CHECKER CAB COMPANY OF DALLAS/FORT WORTH, INC., IRVING HOLDINGS, INC., MSS TRANSPORTATION d/b/a FREEDOM CAB COMPANY, JET TAXI, INC., ABC CAB, INC. d/b/a EAGLE CAB COMPANY, CHECKER CAB COMPANY OF DALLAS, LTD., CHECKER CAB COMPANY OF DALLAS MANAGEMENT, L.L.C., U.S. CAB, L.L.C., AMBACO, L.L.C. d/b/a DIAMOND CAB COMPANY, RACASON, INC. d/b/a STATE TAXICAB COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | RULE 12B(6) MOTION TO DISMISS |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS**

Defendants YELLOW CHECKER CAB COMPANY OF DALLAS/FORT WORTH, INC., IRVING HOLDINGS, INC., MSS TRANSPORTATION d/b/a FREEDOM CAB COMPANY, JET TAXI, INC., ABC CAB, INC. d/b/a EAGLE CAB COMPANY, CHECKER CAB COMPANY OF DALLAS, LTD., CHECKER

CAB COMPANY OF DALLAS MANAGEMENT, L.L.C., U.S. CAB, L.L.C., AMBACO, L.L.C. d/b/a DIAMOND CAB COMPANY, and RACASON, INC. d/b/a STATE TAXICAB COMPANY (collectively Defendants) file this motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

Plaintiffs have asserted antitrust claims against Defendants. Defendants have immunity from those antitrust claims under the state action exemption. The plaintiffs have not alleged any agreement between the local government entities and the Defendants; if plaintiffs had alleged an agreement, the Noerr-Pennington[1] doctrine would provide immunity for such a claim. A Rule 12(b)(6) motion to dismiss properly addresses state action immunity.[2]

## EVIDENCE

Defendants rely upon the plaintiffs' complaint with attachment, and any amendment to that complaint.

## LEGAL STANDARDS

The legal standards for a 12(b)(6) motion include:

1. Dismissal under Rule 12(b)(6) "is viewed with disfavor...." *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).

---

[1] *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)(*Noerr*); *Mine Workers v. Pennington*, 381 U.S. 657(1965) (*Pennington*).

[2] *See Hoover v. Ronwin*, 466 U.S. 558, 582 (1984).

2. "The complaint must be liberally construed in favor of the plaintiff and all facts pleaded in the original complaint must be taken as true." *Id.*

3. Dismissal under Fed. R. Civ. P. 12(b)(6) can occur when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would enable him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

4. "When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court must examine the complaint to determine whether the allegations provide relief on any possible theory." *Ramming v. United States*, 281 F.3d 158, 161-62 (5th Cir. 2001).

5. Notwithstanding the deference afforded a plaintiff's pleadings, a district court does not have to accept unwarranted deductions or conclusory allegations as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982).

6. The district court does not have to presume that the plaintiff can prove facts different from those alleged. *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## COMPLAINT ALLEGATIONS

1. Municipalities and a regional entity approved the Defendants as taxicab permit holders. (Complaint ¶ 2).

2. The Defendants, controlled by the same two individuals, hold about 52%

of the taxicab permits for the Dallas/Fort Worth area. (Complaint ¶ 2).

3.   Through consolidation, the Defendants conspired among themselves to dominate the market.  (Complaint ¶ 3).

4.   Plaintiffs bring their claims under Sections 4 and 7 of the Clayton Act and Sections 1 and 2 of the Sherman Act. (Complaint ¶ 23).

5.   The City of Dallas and the DFW Airport Authority placed a moratorium upon the issuance of any additional taxicab permits. (Complaint ¶ 28).

6.   The municipalities and DFW Airport Authority placed requirements for insurance, inspection, dispatch, and company size on permit holders.  (Complaint ¶ 29).

7.   Stand fees vary depending upon decals (DFW or Love Field) and dispatch services (computer or radio).  (Complaint ¶ 30).

8.   Plaintiffs do not provide computer dispatch services. (Complaint ¶ 33).

9.   Plaintiffs Airport with Dallas Decal stand fees are below, at, or above the Airport with Dallas Decal stand fees allegedly charged by the Defendants. (Complaint ¶ 33)

10.   No allegations of collusion between any of the governmental authorities issuing permits and any of the Defendants.

## LAW

Immunity in this case derivatively flows from a three step process:

    1)    State Action ("Parker[3]") Immunity

    2)    State Action Immunity afforded municipalities

    3)    State Action Immunity afforded private companies regulated by a municipality implementing state law

Immunity from antitrust laws began in *Parker*, which addressed alleged anti-competitive actions by a state. In *Parker*, the Supreme Court first focused on the language in Section 1 and 2 of the Sherman Act.[4] Sections 1 and 2 expressly spoke to anti-competitive conduct between or among persons, not a state and person(s). Sections 7 and 15 of the Sherman Act spoke to State actions, which indicates Congress understood the distinction between a state and a person when it enacted the Sherman Act.

Considering that the states are sovereign, that the federal government just had enumerated powers, and that the Sherman Act's language and legislative history only spoke to conduct by private persons, the *Parker* court reasoned that the Sherman Act did not restrain anti-competitive conduct by a state. That said, a state did not have the ability to extend immunity to a private person the state authorized, by express agreement/collusion/conspiracy, to violate the Sherman Act.[5] Basically, a state could

---

[3]    *Parker v. Brown*, 317 U.S. 341 (1943).

[4]    15 U.S.C. §§ 1 and 2.

[5]    *See Northern Securities Co. v. United States*, 193 U.S. 197 (1904).

permit, but not compel, anti-competitive conduct by private persons.

Absent an express conspiracy between the state and a person, the *Parker* court held the Sherman Act/antitrust law did not apply to a state:

> The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit.

*Parker*, 317 U.S., at 352.

The Court, in *California Retail Liquor Dealers v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980), gave further definition to State Action Immunity. For immunity to attach to its action, a state would have to satisfy a two prong, conjunctive test: 1) the challenged restraint would have to be clearly articulated and affirmatively expressed as state policy, and (2) the State itself would have to actively supervise the policy. *Id.*, at 105.

The first attempt to extend State Action Immunity to local governments proved unsuccessful.[6] The *Boulder* Court reasoned that a city, unlike a state, did not have sovereign status; thus, immunity would not apply. However, if a city were acting in response to a "clearly articulated and affirmatively expressed state policy,"[7] immunity

---

[6] *Community Communications Co. v. City of Boulder*, 455 U.S. 40 (1982).

[7] *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410 (1978).

could attach because a State could effect its policies through its cities. *Boulder*, at 840.

Congress responded to the *Boulder* opinion with the Local Government Antitrust Act of 1984. Congress foreclosed the risk of a cottage industry in antitrust cases against local governments.[8]

> § 35. Recovery of damages, etc., for antitrust violations from any local government, or official or employee thereof acting in an official capacity
>
> (a) Prohibition in general. No damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act[9] (15 U.S.C. 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 35. Congress further extended the Local Government Antitrust Act of 1984 to private persons directed by a local government or someone acting in official capacity for local government:

> § 36. Recovery of damages, etc., for antitrust violations on claim against person based on official action directed by local government, or official or employee thereof acting in an official capacity
>
> (a) Prohibition in general. No damages, interest on damages, costs or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a,

---

[8] 15 U.S.C. § 35.

[9] This same reasoning has been applied to claims under the Sherman Act. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985).

or 15c) in any claim against a person[10] based on any official action directed by a local government, or official or employee thereof acting in an official capacity.

15 U.S.C. § 36.

The courts interpreted the 1984 Act as superceding the *Boulder* opinion, including the removal of any required showing of a specific affirmative grant of a State's authority in every instance, per the 1984 Act's legislative history:[11]

> The legislative history of the Act indicates that Congress, concerned with the number of antitrust actions brought against municipalities and the limited immunity available under the then-existing state action exemption, intended that the phrase "acting in an official capacity" be given broad meaning. An affirmative grant of authority is not required.
>
>> "The definition of official local conduct is intended to be as broad as the local government's authority - encompassing 'legislative, regulatory, executive, administrative, or judicial authority' of a local government. The Committee assumes that this authority will most often stem from broad home rule grants, or from more specific State grants of authority to the local entity. The definition thus removes any requirement

---

[10] Title 15 defines "person" to include the Defendants:

The word "person" or "persons" wherever used in this Act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.

[11] *Montauk-Carribean Airways, Inc. v. Hope*, 784 F.2d 91 (2nd Cir.1986).

> > imposed by the Supreme Court in *Community Communications Co. v. City of Boulder*, [455 U.S. 40, 70 L. Ed. 2d 810, 102 S. Ct. 835 (1982)] that there be a specific and affirmative grant of a State's authority to the local government in every instance."
>
> > H.R. Rep. No. 98-965, 98th Cong., 2d Sess. 20-21, *reprinted in* 1984 U.S. Code Cong. & Ad. News 4602, 4621-22.

*Montauk-Carribean*, 784 F.2d at 94-95.

The Supreme Court next extended *Parker*'s state action immunity to private persons. This extension prevented an immunity end run by suing the private person(s) operating under color of the state act:

> Although *Parker* involved an action against a state official, the Court's reasoning extends to suits against private parties.... If *Parker* immunity were limited to the actions of public officials, this assumed congressional purpose would be frustrated, for a State would be unable to implement programs that restrain competition among private parties. A plaintiff could frustrate any such program merely by filing suit against the regulated private parties, rather than the state officials who implement the plan. We decline to reduce *Parker*'s holding to a formalism that would stand for little more than the proposition that Porter Brown sued the wrong parties.

*Southern Motor Carriers Rate Conference, Inc. v. United States*, 417 U.S. 48, 56-57 (1985).

Under *Southern Motor*, the private person had to show two elements for immunity:

>  (1) State policy clearly articulated and affirmatively expressed the challenged restraint; and
>
>  (2) The state through its agencies actively supervise the private persons' conduct.[12]

The private person did not have to show the state compelled the complained of conduct, only that the state permitted and supervised the conduct.

APPLYING FACTS TO LAW

<u>Element One</u>

Texas Local Government Code § 215.004 provides, in relevant part:

> 215.004. Taxicabs and Limousines
>
> (a) To protect the public health, safety, and welfare, a municipality by ordinance:
>
>  (1) shall license, control, and otherwise regulate each private passenger vehicle, regardless of how it is propelled, that provides passenger taxicab transportation services for compensation and is designed for carrying no more than eight passengers; and
>
>  (2) may license, control, and otherwise regulate each private passenger vehicle, regardless of how it is propelled, that provides passenger limousine transportation services for compensation and is designed for carrying no more than 15 passengers.
>
> (a-1) Subsection (a) applies to a taxicab or limousine service that is operated
> (1) within the jurisdiction of the municipalities;
> (2) on property owned by the municipality, singly or jointly with one or more other municipalities or public agencies;
> (3) on property in which the municipality possesses an ownership

---

[12] *Southern Motor*, 471 U.S., at 50-51 (commonly referred to as the *Midcal* test).

> interest; or
> (4) by transporting from the municipality, municipal property, or property in which the municipality has an interest and returning to it.
>
> (b) The ordinance may include:
> (1) regulation of the entry into the business of providing passenger taxicab or limousine transportation services, including controls, limits, or other restrictions on the total number of persons providing the services;
> (2) regulation of the rates charged for the provision of the services;
> (3) establishment of safety and insurance requirements; and
> (4) any other requirement adopted to ensure safe and reliable passenger transportation service.
>
> (c) In regulating passenger taxicab or limousine transportation services under this section, a municipality is performing a governmental function. A municipality may carry out the provisions of this section to the extent the governing body of the municipality considers it necessary or appropriate.....

The State of Texas clearly articulated and affirmatively expressed its policy to regulate taxicabs through its cities.[13] Effecting state policies through cities can satisfy the first element of state action immunity under *Midcal*[14] and private person immunity under *Southern Motor*.[15]

Here, the State of Texas "contemplated the kind of action complained of" - as

---

[13]   *City of Lafayette,* 435 U.S., at 410.

[14]   *Boulder*, 455 U.S., at 840.

[15]   417 U.S. 48.

set forth in *Town of Hallie*[16] - which satisfies the "clearly articulated and affirmatively expressed" elements of *Parker* exemption. Per the State, Texas cities, by ordinance, <u>shall</u> license, control, or otherwise regulate every taxicab.[17] This satisfies the first prong of the *Midcal* test.

The Texas Statute and city ordinances also satisfy the second *Midcal* prong: active governmental supervision of any private anti-competitive conduct.[18] These ordinances may include regulation of entry into the taxicab business including limits or other restrictions upon the total number of persons providing services, regulation of charges, establishment of safety and insurance requirements, and any other requirement adopted to regulate safety.[19] This includes the power to impose a moratorium on cab permits (regulation of entry), establishment of safety (limit of five years service for taxicabs), insurance requirements (no permit holder having decision making power over its insurance carrier), and stand fees (charges).

In *Southern Motor*, the Supreme Court stated that the second prong in *Midcal* had been met because "the relevant States, through their agencies, actively supervise(d) the conduct of private parties." 471 U.S., at 51. The same reasoning

---

[16]   471 U.S. 34 (1985).

[17]   Tex. Local Gov. Code § 215.004(a).

[18]   *Southern Motor*, 471 U.S. 48 (1985).

[19]   Tex. Local Gov. Code § 215.004(b).

should apply in this case. The State of Texas mandated that cities regulate the operation of taxicabs. In keeping with that mandate, the City of Dallas (App.?) and City of Fort Worth (App.?), by way of example, actively did regulate taxicab permit holders through extensive ordinances. Therefor, *Midcal*'s second prong has been met. Accordingly, the Defendants should receive immunity, having established the two prongs of *Midcal*.

Turning to the primary complained of conduct, consolidation, the cities had the right to determine how many permits they issued and to whom they issued the permits. The right to determine the how many and to whom permit factors allowed the cities to comply with the State's mandate to regulate the taxicab industry.

For example, the City of Dallas had, and has, the ability to withhold permits from the Defendants upon any transfer of the franchise permit. Section 45-2.2.(a) of the Dallas City Code provides:

> [A] franchise or annual permit may not be transferred to another unless the holder files a written application for the transfer in the manner and containing the information prescribed by the director, and the transfer application is approved by the city council. (App.?).

Additionally, the Dallas City Code at Section 45-2/4(a) requires the person that owns, controls, or operates a taxicab service to apply each year for its permits. (App.?). The City of Dallas had the ability each year to deny any consolidation of permit holders (taxicab services) it did not approve of. None of the cities issuing permits to

any of the Defendants have withdrawn permits. The alleged 52 percent (52%) market share for taxicabs has not given the City of Dallas any pause over the seven years of annual reviews since the permit moratorium. (Complaint ¶ 28).

Indeed, such municipal regulation of taxicabs in Texas can extend to the award and creation of a monopoly. A Texas municipality has the ability to afford an exclusive right or privilege of operation to one taxicab company, if it so desires, without running contra to the Texas Constitution's[20] abhorrence for monopolies. *Bellew v. City of Houston*, 456 S.W.2d 185, 187 (Tex.Civ.App. 1970, writ ref'd n.r.e.)(Yellow Cab - Houston Intercontinental); *Airport Coach Services, Inc. v. City of Fort Worth,* 518 S.W.2d 566, 572 (Tex.Civ.App.-Tyler 1974, writ ref'd n.r.e.) (SURTRAN - DFW Airport) *; accord Continental Bus System, Inc. v. City of Dallas*, 386 F.Supp. 359, 364-66 (N.D. Tex1974); *Indep. Taxicab Drivers' Employees v. Greater Houston Transportation Co.*, 760 F.2d 607 (5th Cir.1985) (Yellow Cab - Houston Intercontinental); *Woolen v. SURTRAN Taxicab, Inc.*, 801 F.2d 159 (5th Cir.1986)(SURTRAN - DFW Airport).

From the above opinions, if the City of Dallas and the DFW Airport Authority so chose, they could limit service to DFW International Airport and Love Field to one carrier, notwithstanding the clear monopolistic effect. Accordingly, any argument about stand fees for the airport only services lacks merit. The State gave the

---

[20] Tex. Const. art. I, § 26.

municipalities the authority to regulate service at the airports and the municipalities have exercised that right. This satisfies both prongs of the *Midcal* test.

The State regulation also provides the City of Dallas the authority to establish safety regulations, which would include limiting operating vehicles to five years of service. If a permit holder decides to reduce that time frame by two months (October of the fifth year), that would not constitute monopolistic conduct. The State gave the City of Dallas the right to regulate safety for taxicabs. The Dallas City Code § 45-7.2.1.(a) (App.?) regulates that express authority granted by the State by placing a maximum life limit on taxicabs. The City of Dallas also expressed its right to modify or waive the taxicab age limits. The Dallas City Code § 45-7.2(c) (App.?).

Nothing in that age limit ordinance prevents a taxicab permit holder from taking a taxicab off the streets two months before the five year limit. Indeed, taking an aged taxicab off the streets two months before the limitation period probably provides added safety to the public, because the ordinance does not take into consideration vehicle mileage.

Finally, plaintiffs' contentions regarding the Computer Authority and Airport with Dallas Decal stand fees per week have no basis in fact as alleged. The rates charged by the plaintiffs for stand fees for Airport with Dallas Decal are below, at, or slightly above that of the Defendants, which could not be predatory. Nor do the plaintiffs contend that they fixed prices with Defendants.

Regarding the Computer Authority stand rates, horizontal price fixing and predatory pricing do not apply because the Defendants and the Plaintiffs are not rivals for the Computer Authority stand rates. The plaintiffs do not provide computer dispatch services. This case presents a situation analogous to the company that holds an effective patent and thereby precludes competition[21] versus competing licensees of a patent.[22] The patent holder has no rivals, the licensees do. When no competitor/rival exists, no horizontal anti-competitive conduct can occur because no two persons are on the same horizontal plane.

## CONCLUSION

For the reasons stated above, Defendants ask that the Court dismiss the plaintiffs claims against the Defendants for failure to state a claim, under Fed. R. Civ. P. 12(b)(6). Defendants also request such further relief to which they may show entitlement.

Dated: September ?, 2010

---

[21] *See United States v. General Electric Co.*, 272 U.S. 476 (1926).

[22] *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939).

Case 3:10-cv-01638-N   Document 4   Filed 09/14/10   Page 17 of 17   PageID 60

        Respectfully submitted,

By: /s/ M. Forest Nelson
    M. FOREST NELSON
    State Bar No. 14904625
    BURT BARR & ASSOCIATES, L.L.P.
    203 East Colorado Blvd.
    Dallas, Texas 75203
    (214) 943-0012
    Telefax: (214) 943-4800
    fnelson@bbarr.com

COUNSEL FOR DEFENDANTS

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the answer was served upon the following counsel of record pursuant to under ECF procedures.

Kelly D. Hollingsworth
2200 One Galleria Tower
Dallas, Texas 75240

John W. Bryant
5419 Swiss Ave.
Dallas, Texas 75202

        /s/ M. Forest Nelson
        M. Forest Nelson